23-3217 Lutfi Saalim v. Walmart Inc. et al. Oral argument, 15 minutes per plaintiff, 15 minutes to be shared by the defendants. Mr. Walsh for the appellant. Thank you and good afternoon, your honors. May I please reserve five minutes for rebuttal? Yes, and good afternoon. You may proceed. Thank you, your honor. May it please the court. Thomas Walsh along with my co-counsel, on behalf of the plaintiff appellant, Lutfi Saalim. This appeal arises out of two motions for judgment on the pleadings filed by the Lucas County defendants. The principal federal issue in this matter is whether or not Officer Bretzloff is entitled to qualified immunity as to each of the five uses of force arising out of an instance on April 12, 2020. The first issue here is the district court's improper use of the body camera footage at this early stage of the case. When considering a motion for judgment on the pleadings, this court has made clear that the court must rely on the pleadings and can only consider the video footage where it blatantly contradicts or utterly discredits the pleadings. That was made clear by Bell v. Southfield, Bailey v. City of Ann Arbor, both relying on the Supreme Court's decision and Scott v. Harris. The district court applied the wrong standard here and considered that video heavily to come to its decision. Here, the body camera footage is entirely consistent with the complaint. Appellees don't cite to even one instance in their briefing where the video is contradicted, or I'm sorry, your honors, where the complaint is contradicted by the video. And in fact, in the Walmart appellee's briefing, they state that the video is wholly consistent with the complaint. Where the video is consistent with the complaint, the court must rely on the complaint and the pleadings themselves to make a determination on a motion for judgment on the pleadings. Considering the video at this stage would be heavily prejudicial to appellant, as discovery has not been completed. And considering the video evidence would, in a way, transform this motion into a motion for summary judgment. And that would be prejudicial to defendant as to appellant, as appellant has not had time to complete all discovery. And even if the video were to be considered in this case. Counsel, even if the video was improperly considered, was it harmless to the determination by the district judge? In other words, in what way would the video diverge from the complaint allegations? Your honor, the video diverges in the sense that the district court viewed this video, interpreted it, and made inferences that favored the defendant, the appellees here, in their motion. Since this is a motion for judgment on the pleadings, if the court is to review this video, the video should be reviewed in a light most favorable to appellant as the non-moving party. And where there's any instances of unclarity in the video or ambiguity or a situation that could be interpreted multiple ways, reasonable inferences for those circumstances must be made also in favor of appellant as the non-moving party. That's the source of prejudice here. Also in the fact that since this is a motion for judgment on the pleadings, the pleadings alone are supposed to be referenced. The reason why the court in Bell and Bailey and Scott v. Harris said video footage can be considered is only in instances where the video footage shows something that blatantly contradicts the complaint. And it makes sense in those circumstances to look at the video footage to fill in the gap that's missing in the pleadings. That's not the circumstance here. Well, ultimately though, your position is that whether the video is considered or not, it was still improper to determine that the officer was entitled to qualified immunity. Isn't that ultimately your position? That's correct, Your Honor. Whether or not the video is considered, Officer Breslov is not entitled to qualified immunity for any of the five uses of force here. Based on the pleadings, that is the ultimate conclusion that we would request the court come to, that Officer Breslov is not entitled to qualified immunity. To address the qualified immunity issue, there's a two-part test that the court applies in this regard. First, addressing the objective reasonableness of the use of force. And second, whether the use of force violated clearly established rights at the time of the incident. The totality of the circumstances must be considered here, and it's critical to this analysis. The Graham factors guide this, and here the severity of the crime is minimal, an alleged parking violation on private property. The threat to the officer or others is non-existent. The Lucas County appellate has agreed to that in their brief. And the third factor was the focus of the court here, which is active resistance. Now, this court has held consistently that non-compliance alone does not constitute active resistance. There must be something more. The Shoemade case succinctly talks about active resistance and what that means, and is very applicable to the case here. Isn't Shoemade after this incident? Your Honor, it is. It was published after this incident. However, the Shoemade case applied to conduct that occurred in September of 2019. So, any clearly established constitutional rights applicable to the situation in September of 2019, and any case law that applied to the officer's conduct there, is also applicable to Officer Bratislav's conduct in this situation, which occurred later in April of 2020. But I thought the requirement that it be clearly established at the time of the incident meant that the officers, regardless of what the court might have said later, was clearly established. The officers at the time would have understood that it was clearly established. That is my understanding of the case law as well, Your Honor. And I highlight the Shoemade case because Shoemade points to the published cases that existed as of September of 2019 that instructed the officers on these clearly established constitutional rights. Specifically, the court in Shoemade points to the Rudlaff decision from 2015, and also points to Kent V. Oakland County from 2016. Both of those cases existed and were published at the time of this incident, and that's just for the clearly established right regarding the tasing. If we look at the other uses of force here, Harris v. Circleville points out the clearly established right of an individual not to have force used upon him or her where there is no command given or not reasonable time to respond to a command. That also existed in a published case form prior to this incident. And also it's pointed out in those cases in Smoke v. Hall and LaPlante v. City of Battle Creek is that a person who is handcuffed and generally compliant cannot have a takedown maneuver used to take them to the ground. That's what happened in the fifth use of force in this instance. All of those things were clearly established by published cases prior to this incident. The Shoemade case collects those and puts them together with similar facts, applies them to those facts, and if it was applicable in September of 2019, it was certainly applicable in April of 2020 when this incident occurred. Another very important factor in assessing whether or not there was active resistance here is that Officer Bretslav never once told Mr. Selim he was under arrest throughout this entire incident. Mr. Selim was approached. Within 33 seconds of being approached, Officer Bretslav is opening the door to try forcibly removing him from the vehicle without ever asking him to get out. Within two minutes time, he has stepped out of the vehicle, he's been shoved against the vehicle, and he's been tased two times. That's a strikingly short amount of time for this incident to have occurred. And throughout that time, it is appellant's contention that Mr. Selim did not once actively resist arrest. And if he didn't actively resist arrest, he had a clearly established right at the time of this incident not to be tased. Officer Bretslav, his conduct violated that right on two occasions, along with the other three uses of force that violated separate clearly established rights. What about the issue of whether your client resisted being handcuffed? Obviously, you wouldn't expect him to be handcuffed. I don't suppose he's not under arrest, but was he advised or did he see the handcuffs prior to the attempt to apply the handcuffs and the circumstances there? He did not, Your Honor, and that's precisely the issue here. He didn't know he was going to be handcuffed. We can see it in the body camera video, but Mr. Selim is facing away from the handcuffs. He has no idea that he's about to be handcuffed. Officer Bretslav never says that he's going to place handcuffs on him. He never even says, put your hands behind your back. He says, put your hands on top of the vehicle. So, Mr. Selim didn't know he was under arrest. He didn't know he was going to be handcuffed, and that begs the question, how can he resist being arrested or resist being handcuffed when he didn't know either was going to happen? Okay. What about the appropriateness of the tasing? I guess, if he didn't know he was under arrest, was not resisting, was not told he was going to be handcuffed, what's your understanding as to why the tasing occurred? Well, Your Honor, our position would be that the tasing shouldn't have occurred and it was excessive. However, our understanding from the briefing would be that Officer Bretslav was trying to gain compliance with Mr. Selim. Compliance with what? Certain requests of Mr. Selim, apparently, but also that Mr. Selim was apparently being placed under arrest by a police position. However, Mr. Selim had no way of understanding that to be the case. He was never told he was under arrest. He didn't have reason to believe he was under arrest. Now, your client repeatedly demanded to know why he was being approached or what was going on and all of that. Could the officer have reasonably surmised that he had an uncooperative individual here just from the verbal interchange between the two? A reasonable officer in this situation, I don't believe, could have come to that conclusion, Your Honor. And based on the case law that existed, while there could be some noncompliance, Mr. Selim was polite the entire time. He never used any verbally aggressive language towards Officer Bretslav, never threatened him or made any threatening gestures. He was asking a simple question. What did I do wrong? A question that Officer Bretslav continued to refuse to answer. What did I do wrong? And he continued to ask that question. Although he was sort of noncompliant in not producing his license, he demanded to know why the officer needed to see it. What are we to make of that? Anything that is mere noncompliance, of course, is not active resistance. And even if there was, as Your Honor points out, a failure to produce a license, that doesn't justify any of the uses of force that were displayed here. A person who doesn't present their license has not been subject to a tasing. It would be a direct violation of their clearly established constitutional right to do so. I point the court to cases such as Browning, Vietnamese County, where the court clearly held that even a person's failure to get out of a vehicle is not enough to constitute active resistance. Failure to provide an ID would not be active resistance either. And in this case, Mr. Selim said he would provide his ID. He was going to provide his ID to the officer. He just wanted to know why it was being requested. And the officer did not give him a reasonable amount of time to comply with that request for an ID. Thirty-three seconds from the beginning of the encounter to when Officer Bretzlau opens the car door of Mr. Selim without ever first asking him to get out of the vehicle, being the first use of your honors. If there are no further questions, since my time has expired, I will reserve the rest of my time for rebuttal. All right, we'll hear from opposing counsel. Kevin Pittuck here, Assistant Lucas County Prosecutor, defending Sheriff Navarro, Deputy Bretzlau, and Deputy McNabb. Before I start, I just want to thank the court for last month. To be succinct, my wife had surgery. The surgery was successful. She's home, resting comfortably. Thank you for your consideration last month. As I begin, let me take care of some low-hanging fruit. Number one, the Board of Commissioners was a party in this case. They were dismissed. There's been no argument here about them. The judgment should be affirmed as to the Board of Commissioners. Regarding the state law claims that were asserted, I think it's pretty straightforward that they were all barred either by the statute of limitation or by the fact that Mr. Selim entered a no-contest plea to a criminal charge arising out of his arrest on April 20 of that year. All these state law charges should be affirmed against Bretzlau. Since the only charge against Deputy McNabb is a derivative state law claim, the judgment should be as affirmed to him as well. Let me get into the meat of the argument here in terms of the 1983 claim based on excessive force. A lot of times, there's a number of factors to talk about, but here there aren't because this was a rather innocuous crime. He was parked illegally. There wasn't, for the most part, any officer safety risk here other than once he's out of the car, they're face-to-face for a second. When they're face-to-face, there's always the possibility that the individual can reach in. Mr. Selim could reach in and grab the weapon of the officer. Can we back up just a little bit? Yes, Judge. What is your position as to what the officer was attempting to accomplish here? Obviously, he could have just come up to the vehicle and said, move the vehicle. He didn't do that. He went up and started demanding licenses and other such things. What is your theory as to what the officer was attempting to accomplish for a badly parked or a car in a non-parking position? It's true that he actually could have asked him to move his car. He did not. What he did ask for was his driver's license. He asked for that four separate times and it was not produced. It was only after the fourth time when you can tell the officer, as you watch the video, begins to get agitated. What do you suppose he wanted to see the license? All he had to do was ask the fellow to move the vehicle. Well, that's true. But it is permitted under Ohio law for an officer of the law to seek and look at the driver's license of an individual. Here, he was parked illegally. As to why he did that, we don't know yet. But one thing I do know, it is a crime in Ohio to not produce your license upon request. And here, he was requested four times. And I think it was the... Doesn't there have to be some basis for the request? Like, there's a traffic stop or some other situation that requires investigation by the officer or some reason. I mean, you just can't stop a motorist and demand licenses for no reason. Well, here... I don't think. Maybe I don't know that part of Ohio law. But there was no stop involved. He was already stopped. He was parked illegally. I don't know. That's my point. As I review ORC, it's 4705... Excuse me, 4507.35. It permits him to ask for it. And it's a crime for him to fail to produce it. That's what happened. I find the officer's conduct here completely... When we talk completely divorced of an expression of legal standards, just completely inexplicable. I mean, the parking... I've looked this up this morning. Parking in the wrong place on a private lot is a minor misdemeanor. It's not punishable by jail. It's only punishable by fine, and not a terribly large fine at that. It's capped at $150. I cannot imagine why a police officer would approach this in such a confrontational way. I mean, it would seem, as Judge Clay points out, it would seem the natural thing for a human to do would be to say, could you please move your car? At that point, if he refused to issue him a citation, there's no indication that anybody needed that parking place. I mean, he's just out there sort of throwing his weight around. And he's not even wearing a sheriff's uniform when actually he's functioning as a private security guard. That's all correct. Pardon me? But the reason the officer got agitated, at least as I watched the video, that's how I determined this thing, is that the failure after four times to produce a license, he wanted to have him out of the car then. Well, yeah, but the officer might have... This doesn't have anything to do with the legal standards, but the officer might have displayed a little more maturity. I'm not trying to defend this as good or even average police work. He was disciplined for this. This is on his record. He's still a deputy sheriff, but as long as he's deputy sheriff, this is on his record. This is not something... I don't want to sound like I'm saying he did a fine job here. He did not. But the point is... I just couldn't help but observe that, although it doesn't go to the central legal issues. I mean, the real question, did he violate the Constitution? I mean, is this case more like the Bell case, which I cited, or more like the Shoemade case, which, if I remember correctly, Judge Clay authored? In my view, it's unsurprisingly, it's more like Bell. That's what the district court thought. I mean, if you read the first paragraph of the Bell decision, it sounds like this case, where you had a standoff, and then the officers forced the individual out of the car. Well, Bell was different because the man there was actively resisting. He was not refusing to comply, refusing to be handcuffed. He was loud and resistant, and the factual circumstances were different. I mean, in fact, the guy just got on the ground, in Bell, was putting his arms under his body, and so they couldn't handcuff him. The loss of circumstances were different in that case. Well, there's one statement from Bell that talked about where indisputable evidence shows him actively resisting that he repeatedly pulled his arm away when he was trying to be handcuffed. That's kind of what happened here, Judge, in terms of handcuffing and all that. Let me circle back to one point before I get too long, because you had mentioned a point earlier about considering the video. You suggested, I think, that this was harmless error to do so. I believe that to be correct, especially— I wasn't suggesting it was harmless error. I was asking whether it was harmless error. That was my hope, Judge, perhaps. But in any event, I would consider it harmless error, given the number of times the video itself is cited in the complaint, along with timestamps. I mean, it seems illogical to talk about a video, list the timestamps, and then not permit the judge then to look at it. That actually video shows what happened here in terms of— from beginning to end, from the time when— Well, one thing that happens on the video is that the man was tased, and then the claim is that he had to be tased again, but he wasn't given an opportunity to comply, because there are only eight seconds between the first tasing and the next tasing, so the officer didn't even give him time to comply within the instructions. I think I've noticed about the entire video, not just these eight seconds there, but the words of Mr. Saleem are very calm in terms of what he's doing or not doing, but his actions are different. He's always moving around. He's always— I guess there was a term used from the Shoemake case about whether an individual who is kicking, flailing, or wriggling away can be called an active resistance. Well, here there was no kicking, but there was certainly a lot of flailing and a lot of wriggling away from the time when the officer tried to get him to keep his hands either on top of the car or away from it so he could be dealt with here. But yes, it would have been better if it was longer than eight seconds, but there was never a time when he stopped wriggling or stopped moving around so that this thing could actually be ended. When he finally was tased the second time, that stopped it. I mean, after that, it ends, and essentially the video, as Mr. Walsh said, it lasted a little over two minutes, and after the second tasing, he's arrested, and that's the end of this. I know I have 10 seconds left. It's just my request that you affirm the judgment of the District Court, and thank you. All right. Thank you very much, and we'll hear from Ms. Knight. Thank you, Your Honor. Excuse me. Yes, you may proceed. May it please the Court. My name is Taylor Knight. I represent the Appalese Walmart Source East LP and Walmart Inc. As you know, Walmart has sort of a very tangential involvement in this case in that the only claims that are asserted on behalf of Walmart are derivative claims for the state law claims that were asserted against Deputy Bretslav. I fully agree with Attorney Pituk that the state law claims were appropriately dismissed. I think it's been very clearly briefed. Just to touch briefly on the issue of equitable tolling, that has been identified throughout the appellant's brief as the reasoning as to why their claim should be deemed timely. There is no evidence in this case or any case law to support that equitable tolling applies. Instead, it appears that appellant misread the tolling order by the Ohio Supreme Court and misapplied it to this case, and his failure to read it correctly is not an appropriate basis under the law in order to allow for equitable tolling for any of the state law claims. Instead, equitable tolling is generally employed during circumstances where the individual is tricked or misled and somehow misses the filing deadline. There are no circumstances in this case that would lead us to believe that happened, and on that basis alone, all of the state law claims should be dismissed as untimely. And if all of the state law claims are dismissed, there are no claims on which to base any claim against Walmart. And so Walmart was appropriately dismissed by the district court as well. Let me make sure I understand procedurally. The district judge did rule on the statute of limitations, some of the statute of limitations issues that would impact your client, but some of the state law claims for precarious liability and other issues were not ruled upon. I guess the judge was saying he wouldn't need to rule on some of those because of his ruling on qualified immunity, that he didn't have to address some of the claims. So if the case were to go back, there are some claims, some state law claims that are unaddressed that might implicate your client that are yet to be ruled upon. Is that right? I don't believe so. I believe the district court addressed all of the state law claims. There was an assault claim, a battery claim, a false imprisonment claim, and then an intentional infliction of emotional distress claim. There is also, and what I think maybe you were alluding to, excuse me, a negligent hiring, negligent hiring, supervision, training, and retention claim, as well as the respondeat superior that I guess from a merits perspective don't appear to have been ruled on in the district court ruling. However, they were because both of those claims require an underlying tort to go forward. Sure. Yeah. I mean, that's the point. Negligent hiring that claim involved Wal-Mart. There were some claims that did involve Wal-Mart that were not ruled upon. I'm not saying how the judge should rule if they were to go back. I don't even know if the case would be remanded or who would prevail and disappeal. But there were claims that were not ruled upon that didn't implicate Wal-Mart as far as I can tell. You know, if you don't have anything further, we'll look into that, I'm sure. Yeah. I mean, I think my reading of the district court ruling and just, you know, being more well-versed in state law than federal law, to be totally honest, the state law claims are the negligent hiring claim and the respondeat superior claim. Both of claims under Ohio law require an underlying tort. And so if the state law tort claims are dismissed by this court or that dismissal is upheld, regardless of what happens with the 1983 claim, those claims are dismissed as well because they are state law claims that require an underlying tort in order to go forward. And I think that's what the court said is we didn't need to delve into the specific merits of either of those claims because they require an underlying tort. I had one other thing I really wanted to address briefly is the use of the video. I think the part that's been missed in all of the briefing are not really identified, but Mr. Pittuck identified it in part of his discussion is that the body cam video was very well incorporated into the complaint by the plaintiff. Quite frankly, it was identified in timestamps from paragraphs 40 through 86. And then the plaintiff provided us with two separate YouTube citations to where the body cam footage can be viewed from the perspective of various news outlets who got a hold of it from plaintiff's counsel and their opinions on the video. And I find it very difficult to say that it can't be considered when it was so well incorporated into the complaint, particularly when there is a Sixth Circuit case law in Gardner v. Quicken Loans, wherein the court has said that documents or evidence incorporated into the complaint is appropriately considered on a motion to dismiss or a motion for judgment on the pleadings. So for the appellants to now say that the body cam footage, which they very heavily relied upon in their subjective rendition of what between Mr. Saleem and Deputy Bretzloff, really isn't supported by the law, regardless of the 1983, are we allowed to use the video or are we not allowed to use the video? My understanding of all of the case law that's been addressed with respect to whether videos can be considered, it was not incorporated into the complaint and instead it was provided as an exhibit to the motion to dismiss or to the motion for judgment on the pleadings. That's not what we have here. It was very well incorporated into the complaint. The district court viewed it in its own lens, from its objective view, based on what was in the pleadings, in its own video, in the law, and all of it can be considered by this court. I see my time is up, unless you have any other questions for me. You know, I didn't understand that to be your opposing counsel's argument that I understood his argument to be that you couldn't use the video unless it blatantly, under the case law, unless it blatantly contradicted the pleaded facts. And it could be in the complaint because it might come up later in motions for summary judgment or other things that might develop in the case. But I thought he was arguing or argued that whether it could be utilized in the motion on the pleadings early on was based upon whether it blatantly contradicted the allegations. So, maybe I'm wrong, and if I am, I'm sure you'll tell us. But in any event, if we have anything more to say on that, certainly you can. Sure. I do think that's his argument, but I think his argument misses the mark in the sense that the cases that tell us that, so Bell, for example, it says body cam footage can be used when it's contradictory to the allegations in the complaint are circumstances where the body cam footage or any surveillance footage, quite frankly, was not incorporated into the complaint by the plaintiff. We have a different situation here where the body cam footage was very heavily relied on and incorporated into the complaint by the plaintiff. And so now he has to sort of, excuse my expression, lay in the bed that he made, and he incorporated the body cam footage into his complaint through timestamps from paragraphs 40 through 86. He's very clear about the timestamps. He provides you two YouTube citations. You can access the video yourself. And so for him to rely heavily on the video and use his, say, his subjective interpretation that he's then written about what happens at each level of that video is the only thing that can be considered, I think is not supported by the law. I think if it was a circumstance such as Bell where the body cam footage was not incorporated into the complaint by the plaintiff and was provided instead as part of the defense in response as an exhibit to the motion for the judgment on the pleadings, I think that that would be a different question. But in this case, we have it very clearly and extensively incorporated into the complaint by the plaintiff. So separate and apart from the law that we get under qualified immunity standards and what can and can't be considered, it is appropriate for the court to consider something that's incorporated into the complaint on a motion to dismiss or a I gather what you were doing is essentially analogizing the video to the kinds of documents that can be attached to a complaint. Is that a fair summary? Yes. Anything further? That's all I have. Thank you so much. All right. Well, your rebuttal. Thank you, Your Honor. First to address Judge Clay, Your Honor's points regarding the derivative claims and the claims not addressed by the district court as to Walmart, specifically to the claim for negligent hiring, supervision, training, and retention that's addressed in count nine of appellant's complaint. That claim, the Ohio Supreme Court has made clear it does not require a showing of civil or criminal liability for the employee in order for plaintiff to succeed as to this claim for the employer. That means that appellant here does not need to show Officer Bretzlaff was civilly or criminally liable in order to succeed on the negligent hiring, training, supervision, or retention claim. That comes from Evans V. Akron General Medical Center. That's 2020 Ohio 5535 at paragraph 10. So that is not the case there. And even despite that point, as Your Honor points out, there remain issues at the district court level as to the Walmart defendants that were not addressed. They were not decided on the merits. And we'd ask that if this, regardless of this court's position on other issues before today, that that matter, those issues be reversed and remanded to the district court. And that if for whatever reason the district court no longer has jurisdiction over those matters, that the district court be instructed to dismiss them without prejudice subject to Ohio's savings statute so that plaintiff can reassert those claims in an distinction from Bell that counsel for the Lucas County appellees brought up. Bell is clearly distinguishable as Your Honor pointed out as well. In Bell, Eugene Bell and Officer Corkus have a conversation at the car side for three minutes before Officer Corkus even tries to open the door. In three minutes time, all five uses of force had occurred in this case. And after that point, Eugene Bell's door has to be pried open. Three minutes later, Officer Corkus, I believe, was on Eugene Bell's back, the other two officers on the left and right side, prying his arms to behind his back to handcuff him. Only after all of that is he warned about being tased, and then he's tased. Your Honors, that's an example of active resistance. And that's an example that is in stark contrast to the case that is before this court today. Another matter brought up by Lucas County defendants here was the eight seconds prior to the second tasing. And Judge Clay, I believe Your Honor brought that up as well. And that is very important for this analysis because the court instructs that as the court is looking through these five uses of force, the court must look at the conduct that happens immediately prior to each use of force. Here, there's eight seconds between the first time Officer Bretslav tases Mr. Saleem, causing him to fall backwards into his vehicle, and the limited seconds later that Officer Bretslav then lunges into the vehicle with a taser in his right dominant hand, handcuffs in his left, and is seeking to do one thing. And that one thing is drive-stun Mr. Saleem and use the taser on him a second time in another violation of his clearly established constitutional rights. A notation on the video that was discussed here at the end in the reference to as well. As Judge Gibbons, Your Honor, pointed out, this is a correlation with the court standards for incorporating documents into the complaint, not video evidence. Video evidence is much more significant than a document. Video evidence can be interpreted in multiple different ways, as we see here with how the district court interpreted the video and then applied the law to it. There's different interpretations that can be rendered from this video. We see Internal Affairs Bureau's report. They interpret it in a way that corresponds quite well with appellant's understanding of the video. However, the district court viewed it in a much different way than the Internal Affairs Bureau. When these questions of interpretation, as counsel for Lucas County Appaloose brought up several questions, he said at one point, we don't know this information yet. Well, that's precisely the point here. This is a motion for pleadings. If we're going to get into the weeds of talking about factual issues, it is critical that we are able to provide the evidence through discovery that would otherwise have been able to be obtained and then review that matter and review whether or not there are genuine issues of material fact. Unfortunately, appellant hasn't had that opportunity. That's why at this stage it's so important that video evidence wouldn't be considered and that only pleadings are relied upon. The notation on the Bell case, in Bell, the court does note that Bell relies on the video evidence in his pleadings and in his complaint. That's part of the reason why Bell ruled in the way they did, that the video evidence was incorporated, but also, critically, that in Bell, the video evidence contradicted Bell's allegations. That's the only reason Bell allowed the video evidence to be considered at that early stage in the case. It's admitted here that the complaint is consistent with the video. Therefore, the court should not consider that here in this early stage, a motion for judgment on the pleadings. Your honors, I see that my time has expired. I respectfully request that this court reverse the district court, remand this case for further proceedings before the district court corresponding with the circuit's case law. Thank you very much. Well, thank you and thank all counselors for their able presentations. And that concludes the arguments. The case is submitted.